# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PJT HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0665-JTL |
| | ) | |
| DANIEL COSTANZO, | ) | |
| BENJAMIN COSTANZO, and | ) | |
| BRIAN FITZPATRICK, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PBM GROUP HOLDINGS, LLC, | ) | |
| a Delaware limited liability company, | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## POST-TRIAL OPINION

Date Submitted: March 21, 2025
Date Decided: May 15, 2025

Daniel M. Silver, Benjamin A. Smyth, Maliheh Zare, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff*.

Delia Clark, COOPER LEVENSON, P.A., Wilmington, Delaware; Justin D. Santagata, COOPER LEVENSON, P.A., Atlantic City, New Jersey; *Attorneys for Defendants Daniel Costanzo, Benjamin Costanzo, and Brian Fitzpatrick*.

**LASTER, V.C.**

An investor and three sweat-equity operators planned to launch a chain of fast-casual restaurants. They formed a member-managed Delaware limited liability company, and each became a member. After a falling out, the three sweat-equity members invoked a provision in the LLC agreement to expel the investor member.

The investor sued for breach of the LLC agreement and sought a declaration that his expulsion was invalid. The sweat-equity members counterclaimed for determinations that they acted properly and that the investor had breached the LLC agreement.

The sweat-equity members proved they had at least two valid grounds to expel the investor. In doing so, they proved that the investor breached the LLC agreement. The investor must indemnify the sweat-equity members for their expenses, including attorneys' fees, caused by his breach.

## I.    FACTUAL BACKGROUND

The facts are drawn from the post-trial record, which includes eighteen stipulations of fact, 300 exhibits, depositions from eight witnesses, and live testimony from two witnesses.[1] This decision has relied judiciously on the testimony of Peter Trematerra, because his testimony changed significantly between his deposition and trial. This decision has exercised similar care when weighing the testimony of Christopher Russo, a consultant who solicited an investment from Trematerra during

---

[1] Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX __ at __" refer to trial exhibits.

the events giving rise to this litigation,[2] and documents Russo prepared after disputes arose.[3] Having evaluated the credibility of witnesses and weighed the evidence, the court makes the following findings by a preponderance of the evidence.

## A. The Founders Meet Trematerra.

Daniel Costanzo, Benjamin Costanzo,[4] and Brian Fitzpatrick (the "Founders") operate a restaurant in Palm Beach Gardens, Florida, called "Plant Based Mafia" (the "Original Restaurant"). The Original Restaurant is a mafia-themed Italian restaurant that only uses plant-based ingredients. The Founders and a silent partner own the Original Restaurant through Plant Based Mafia LLC (the "Original LLC").

Trematerra is a wealthy real estate developer. In 2021, he ate at the Original Restaurant, loved the food, and liked the mafia theme. Trematerra suggested that with his money and connections, the Founders could launch a chain of restaurants.

The Founders and Trematerra agreed to launch three restaurants in Florida. Trematerra would provide the capital, and the Founders would provide the sweat equity. The Founders also would contribute their "Plant Based Mafia" intellectual property.

---

[2] *See* JX 178.

[3] *See, e.g.*, JX 4; JX 20; JX 181; JX 259; JX 270.

[4] I normally identify individuals by their last names without honorifics. In this case, two defendants have the same last name. Going forward, this decision refers to Daniel Costanzo as "Daniel" and his brother, Benjamin Costanzo, as "Benjamin." Neither usage implies familiarity or intends disrespect.

**B.    The Governing Documents**

As the vehicle for their venture, the Founders and Trematerra formed PBM Group Holdings, LLC (the "Company"). Its four members were the three Founders and PJT Holdings, LLC (the "Investor"). Trematerra controlled the Investor. For simplicity, this decision generally refers to Trematerra, even when the Investor is technically the pertinent actor.

The Company's limited liability company agreement (the "LLC Agreement")[5] established a member-managed structure, stating:

> The management of the Company is fully reserve to its Members in proportion to the Members' respective Percentage Interests; the members shall have the sole and exclusive control of the management, business and affairs of the Company, and the Members shall make all decisions and take all actions for the Company not otherwise provided for in this Agreement.[6]

The LLC Agreement authorized the members to take action at meetings by the affirmative vote of the holders of a majority of the member interest (the "Majority Action Requirement").[7] Trematerra held a 50% member interest. The Founders held the other 50%, which they divided equally. The LLC Agreement provided that "[s]o long as [Trematerra] owns fifty (50%) percent or more of the Membership Interests in the Company, in the event of any deadlock of the Members, [Trematerra] shall

---

[5] JX 27 [hereinafter OA].

[6] *Id.* § 6.01.

[7] *Id.* § 8.01(a).

have the deciding vote to break the deadlock" (the "Tiebreaking Vote").[8] The members could take action without a meeting, but only by unanimous written consent.[9]

The LLC Agreement contained an expulsion mechanism that allowed a member to be expelled for contractually specified reasons by the unanimous vote of the other members (the "Expulsion Provision").[10] The LLC Agreement also contained an indemnification provision that requires any member who breached the LLC Agreement to indemnify the Company and the non-breaching members for any losses resulting from the breach (the "Indemnification Provision").[11]

The Founders and Trematerra also entered into a Contribution and Investment Agreement (the "Contribution Agreement").[12] The LLC Agreement incorporated the Contribution Agreement by reference.[13]

In return for their 50% equity interest, the Founders agreed in the Contribution Agreement to contribute the intellectual property they developed for the

---

[8] *Id.*

[9] *Id.* § 8.05(a).

[10] *Id.* § 15.04.

[11] *Id.* § 18.11.

[12] *See* JX 26 [hereinafter CA].

[13] *See* OA ¶ C.

4

Original Restaurant, including its brand. The Founders claimed to have spent nearly $1,000,000 developing the intellectual property, plus many hours of their own time.[14]

In return for his 50% interest, Trematerra agreed in the Contribution Agreement to make an initial equity investment of $200,000 (the "Initial Capital Contribution"), due at closing. He also committed to provide additional capital totaling $3,300,000 (the "Additional Capital Contributions"). The Contribution Agreement recognized that both were equity investments.[15]

The LLC Agreement provided that if a member failed to make a capital contribution when due, then the member became a "Defaulting Member."[16] An expelled member also became a Defaulting Member.[17] The LLC Agreement specified

---

[14] Daniel Tr. at 25–26. Although that figure seems high, nothing in the record contradicts it. At trial, Trematerra inexplicably testified that the Founders never contributed intellectual property to Company. Trematerra Tr. at 454–58, 504–05. Yet there is an agreement documenting the transfer and giving Trematerra a security interest, which he signed. *See* JX 39.

[15] CA ¶ C ("[Trematerra] shall be assigned and receive fifty (50%) percent [sic] membership interest in the Company in exchange for an investment of equity capital in the Company in the initial amount of $200,000.00 and a committed capital investment up to 3,500,000.00 [sic] as provided in the [LLC Agreement]."). The LLC Agreement also identified Trematerra's contributions as equity investments. *See* OA ¶¶ C, D.

[16] OA § 15.01.

[17] *Id.* § 15.04.

potential remedies that the remaining members could impose on a Defaulting Member, including forfeiture of the Defaulting Member's interest.[18]

The parties dispute the nature of Trematerra's obligations to make the Initial Capital Contribution and the Additional Capital Contributions. This decision addresses those disputes in the Legal Analysis. In any event, Trematerra never made a lump-sum contribution at closing equal to the Initial Capital Contribution. Nor did any of the Founders demand that he do so. They allowed him to pay expenses as they came due. By the time the parties' relationship soured, Trematerra had not yet paid expenses equal to the Initial Capital Contribution. The Company also never made a formal capital call on Trematerra for an Additional Capital Contribution.

## C.    The Vendors

Well before executing the governing documents, the parties began working with Russo, a restaurant industry expert. Russo estimated that starting up three Florida-based restaurants would cost around $3.5 million. That figure formed the basis for Trematerra's capital commitments.

The parties now disagree on whether they planned on three new restaurants or one to three new restaurants. The plan was three. But that number was not set in stone, nor did the LLC Agreement or the Contribution Agreement condition anyone's obligations on a particular business plan.

The Company also retained other vendors, including:

---

[18] *Id.* § 15.01(g).

- Push, Inc, a marketing and branding consultant;

- Gravity Architecture and Design, LLC, an architectural firm owned by Ray Schaefer;

- Nartowicz International Culinary Consulting, LLC, a culinary consulting firm owned by Jay Nartowicz;

- Plave Koch PLC, a law firm specializing in intellectual property; and

- Saraga/Lipshy, PL, a law firm that addressed more general business issues.

During 2022 and 2023, the Founders and Trematerra worked with the vendors, who billed the Company for their services. The Founders assert that Trematerra did not pay the full amounts of their invoices in timely fashion, instead paying late and only the amounts he thought warranted for the work. The Founders contend that Trematerra's payment practices jeopardized the Company's relationships with the consultants and harmed the Company. This decision analyzes that assertion in the Legal Analysis.

**D.    The Pivot To California**

Although the members originally planned to launch the new restaurants in Florida, the real estate market "was very tight."[19] After looking at various locations around the country, the members decided in late 2022 to focus on Southern California. They identified a location in Beverly Hills, targeted a second location in Huntington Beach, and were evaluating a third location in downtown Los Angeles.

---

[19] Russo Dep. 123.

With the members' consent, Russo signed a letter of intent for the Beverly Hills location in January 2023. Russo then engaged DLA Piper LLP to represent the Company in negotiating a lease (the "Lease"). The Founders authorized Trematerra to oversee the negotiations with the landlord (the "Landlord"). Trematerra provided the Founders with regular updates and a chance to review drafts.

## E.     Trematerra Proposes A Restructuring.

Opening in Southern California meant higher startup costs than in Florida. Materials and services generally cost more in Southern California. Not only that, but not all of the Founders would relocate to Southern California, so the budget had to include additional managerial expense. Russo estimated that opening one restaurant in California would require $1.35 million. Building out three restaurants and funding their expenses for ninety days would require $4,282,975.[20]

The new estimate for three restaurants was more than Trematerra had agreed to invest. On January 27, 2023, Trematerra, the Founders, and Russo met at Trematerra's home in Singer Island, Florida. Trematerra proposed to increase his commitment to $5 million in exchange for 70% of the Company (the "Restructuring").[21] The parties dispute whether Trematerra said he would not go

---

[20] JX 18.

[21] The Founders assert that Trematerra initially demanded 90% of the Company. *See* Trematerra Dep. 59. Trematerra disputes that, but agrees he asked for 70%. Either way, he refused to go forward unless the Founders agreed to change the deal.

forward without the Restructuring. At a minimum, he implied it. The members discussed the Restructuring but did not reach agreement.

During February 2023, negotiations with the Landlord moved forward. The members did not make any progress on the Restructuring.

## F. Trematerra Signs The Lease.

At the beginning of March 2023, the Founders sent Trematerra a confusing series of communications. On March 3, Daniel emailed Trematerra that they were "going to respectfully decline your offer to dilute our ownership by 50%" and wanted to "stick with [the] original deal."[22] Daniel then alternatively offered to sell Trematerra another 25% of the Company's equity for $10 million or sell him the entire business for $30 million.[23]

Hours later, Benjamin sent Trematerra a different counteroffer. That counteroffer proposed having Trematerra cover the full cost of opening three restaurants in California in exchange for a 90% ownership stake in the first two restaurants, a 70% stake in the next three stores, then 50% ownership after that, plus 25% of the Founders' cash flows until Trematerra's investment had been repaid. That counteroffer contemplated salaries for the Founders and protection for them against further dilution.[24] No agreement was reached.

---

[22] JX 141 at 1.

[23] *Id.* at 2.

[24] *See* JX 139.

On March 4, 2023, Daniel texted a list of "deal points" to Russo.[25] Russo relayed them to Trematerra.[26] During a Zoom call later that day, Daniel became angry with Trematerra. After the meeting, Trematerra sent the Founders the following text: "Gentlemen, I wish you the best of luck. I will not be abused and disrespected in this manner [sic] let's figure out what we have to do for you to move forward for you [sic] to buy out my percentage of the company."[27]

By making that statement, particularly after earlier implying (at a minimum) that he would not fulfill his commitments to the Company without the Restructuring, Trematerra repudiated his obligations under the LLC Agreement. That might seem to have ended the relationship, but Benjamin and Russo asked Trematerra to stay involved and promised he would not have to deal directly with Daniel. No agreement was reached.

On March 5, 2023, DLA Piper sent the Landlord a final redline and signature version of the Lease. The Landlord agreed to the terms. Trematerra, however, raised a new issue. The Lease gave the Company an initial period of 195 days before it had to begin paying rent. Trematerra did not think the restaurant could become operational in that time, so he proposed extending the initial period to 240 days.

---

[25] JX 154 at 247–50; Daniel Tr. at 84–88.

[26] Trematerra Tr. at 493.

[27] JX 142.

Russo texted the Founders about Trematerra's request for 240 days. The Founders reacted angrily, believing that Trematerra had gone rogue and jeopardized the Lease by asking for more time.

At 8:28 am on March 8, 2023, Daniel texted Trematerra: "Lets [sic] go grab a f*****g beer, bury the hatchet, go to war and build PBM into one [sic] the successful brand we know it can be. We don't just need money Peter, [sic] we need leadership and we need your leadership now more than ever."[28]

But the Founders were also contemplating a Plan B. They expected Trematerra to refuse to sign the Lease or fund the Company unless they agreed to the Restructuring.[29] The Founders wanted a "contingency plan," so they began evaluating whether they could invoke the Expulsion Provision or claim that Trematerra had defaulted on his capital commitments.[30] Thirty minutes after texting Trematerra, Daniel texted his legal advisor, "We are thinking about regrouping, calling on our default clause, [and] kicking [Trematerra] out of the LLC . . . ."[31]

Thirty minutes after that, Trematerra responded to Daniel's "bury the hatchet" message with the following text: "[W]e are trying to negotiate one last point on the lease. I don't want to waste potentially $50,000 worth of rent before the restaurant is

---

[28] JX 154 at 31.

[29] *See* Daniel Tr. 97–98; JX 154 at 376–78.

[30] *See* JX 154 at 423; Daniel Tr. 100–03.

[31] JX 154 at 423.

11

completed. I need you [sic] Ben and Brian to send me the [acknowledgement] that the percentages have been changed to 70 :: 30% [sic] etc."[32] Trematerra thus again implied that he would only fulfill his commitments if the Founders agreed to the Restructuring.

Daniel asked Trematerra for a meeting between just the two of them, noting that "[s]igning the lease means nothing if you and I haven't cleared the air."[33] Minutes later, at 9:25 am, Daniel wrote "[a]s far as the percentage [sic] we need a simple amendment to the current operating agreement" and that Trematerra could have his lawyer "send that this morning."[34] Trematerra declined to meet with Daniel or to call him that day, offering only "Maybe tomorrow."[35]

Over the course of the rest of the day, the Landlord accepted Trematerra's request for 240 days before rent began. Trematerra signed the Lease and a personal guaranty (the "Personal Guaranty"). The rent payments totaled $1.75 million over ten years. That was well within the $3.3 million of Additional Capital Contributions that Trematerra had committed to make to the Company, while still leaving $1.55 million to build out the restaurant. Developing a single restaurant would have departed from the original plan to develop three restaurants, but the three-

---

[32] *Id.* at 32.

[33] *Id.*

[34] *Id.*

[35] *Id.*

12

restaurant plan was just that—a plan. It was not part of the LLC Agreement or the Contribution Agreement, and no one's contractual obligations were conditioned on it.

Trematerra contends that he signed the Lease because he believed Daniel had agreed in principle to the Restructuring through his 9:25 am text.[36] But because of the Majority Action Requirement, Trematerra did not have the right to decide unilaterally whether or not to execute the Lease. Trematerra and the Founders had made the decision to go forward with a restaurant at the Beverley Hills location. Trematerra could not refuse to implement that decision. If Trematerra had called a meeting of the members to reconsider the plan, then a majority of the members could have decided on a different course. If a deadlock had ensued, then Trematerra could have broken the deadlock with the Tiebreaking Vote, but he could not make decisions unilaterally on behalf of the Company.

Although no one realized it at the time, the Lease mistakenly identified the Original LLC as the tenant rather than the Company.

## G.    The Founders Reject The Restructuring.

Over the next five days, little happened. Then on March 13, 2023, Trematerra sent the Founders a document titled "Assignment of Membership Interest" (the "Assignment").[37] It only changed the equity allocation so that Trematerra owned 70% and the Founders owned 30%. It included none of the Founders' terms. The

---

[36] *See* Trematerra Tr. 404.

[37] JX 6.

Assignment contained an integration clause, making clear that upon execution, it would reflect the parties' entire agreement.[38]

> After receiving the Assignment, Daniel texted Trematerra:
>
> Peter our deal will most likely take 2-3 days to complete. The 70-30 has been agreed on however there's some language we need addressed that confirms the investment changes you spoke about and why you want the 70-30 change.
>
> Don't let our deal change hold up the rest of the contracts that need to move forward.
>
> Right now we need to negotiate and operate in good faith while you and Russo drive this train forward. We can't stand to miss a day, let alone 2-3 weeks.[39]

That message is difficult to parse. Daniel seemed to be saying that the Founders had agreed to the reallocation of equity conditioned on the deal points they had asked and that would need to be added to the Assignment.

> Trematerra texted back promptly:
>
> Unfortunately, I cannot do that. I have too much money at risk. This is a simple addendum that was sent. All of the terms and conditions of the agreement are in effect. If you need to return you [sic] to call my attorney I would have him do so today we cannot wait any longer. Otherwise we need to let this location go.[40]

By stating that "[a]ll of the terms and conditions of the agreement are in effect," Trematerra sought to take advantage of the Founders' relative lack of sophistication.

---

[38] *Id.* § 6.2.

[39] JX 154 at 2.

[40] *Id.*

He expected them to sign the Assignment, at which point he would cite the integration clause to argue that the document reflected their entire agreement.

Later that evening, Trematerra told Daniel again that if the Founders did not agree to the Restructuring, then he would cancel the Lease.[41] Trematerra did not have the right to do that. Trematerra and the Founders had made the decision to go forward with a restaurant at the Beverley Hills location. Because of the Majority Action Requirement, Trematerra could not unilaterally cancel the Lease. Here again, Trematerra could have called a meeting of the members and proposed to cancel the Lease. If members holding a majority interest agreed, then Trematerra could have acted. If a deadlock had ensued, then Trematerra could have broken the deadlock with the Tiebreaking Vote. What Trematerra could not do was act unilaterally on behalf of the Company.

On March 14, 2023, the Founders notified Trematerra that they would not proceed with the Restructuring, stating: "After careful consideration and lengthy conversations with our business advisor . . . we are not comfortable re-trading the 50/50 deal we agreed to."[42] The Founders also told Trematerra that they would not proceed in California:

> We do not think it makes sense at this time to go to California despite knowing how successful we will be out there. You've expressed to us several times that you're not comfortable with California and that you

---

[41] *See* JX 154 at 46–47.

[42] JX 155 at 1.

15

had always believed we'd launch in Florida. So with that said, we strongly feel Florida is where we should launch.[43]

Trematerra sent the following response:

Team ; [sic] I have invested well over $250,000 at this time plus my resources. Additionally, my time, travel, efforts etc. [sic] I will cancel the California transaction today .until [sic] we can get a path [t]hat is an agreeable [sic] I cannot spend any more time on this venture. Let me know when you have something that you think is viable in Florida.. [sic][44]

Trematerra agreed at trial that the $250,000 was exaggerated.[45] His statement that he "cannot spend any more time on this venture" constituted a repudiation of his obligations under the LLC Agreement.

With the Founders having told Trematerra they were not willing to proceed in California, Trematerra told the Landlord on March 14, 2023, that he could not proceed with the Lease. While understandable as a way to mitigate the Company's liability under the Lease and his own liability under the Personal Guaranty, Trematerra did not have the right to do that. He needed to call a meeting of the members, attempt to reach agreement on a plan forward, and (if necessary) exercise the Tiebreaking Vote.

The Landlord was not happy with the news. He pointed out that they had spent weeks negotiating the Lease, and he had agreed to the late request for a 240-day

---

[43] *Id.* at 2.

[44] *Id.* at 1.

[45] Trematerra Tr. 536–37.

16

grace period, yet Trematerra had cancelled the day after signing. The Landlord threatened to enforce the lease as written but offered to settle for about $197,000.[46] Trematerra hired counsel and engaged in negotiations with the Landlord.

On March 15, 2023, Trematerra and the Founders went back and forth with more proposals. Russo texted the Founders that it would be difficult to restart in Florida because they had "wasted a lot of people's time" and burned "a lot of bridges" by previously rejecting Florida locations.[47] Daniel texted Trematerra that "[the Founders] can still do LA and just open[] it up as one store" and that they "could stick with the deal that [they] have on the table."[48] Trematerra refused, saying that "the basis of the deal has changed."[49] Trematerra asked for a buyout.[50] His refusal constituted another repudiation of his obligations under the LLC Agreement.

Trematerra did not have the right to refuse to comply with his obligations under the LLC Agreement because he personally thought that "the basis of the deal has changed." Trematerra made capital commitments to the Company. Those capital commitments were not conditioned on a particular business plan. Trematerra had to fulfill his capital commitments if the Company called on him. Here too, he could have

---

[46] JX 159 at 2.

[47] JX 154 at 286.

[48] JX 154 at 36.

[49] *Id.*

[50] JX 154 at 37–42.

17

called a meeting of the members, tried to convince the Founders to go in a different direction, and broken any deadlock with the Tiebreaking Vote, but he could not decide unilaterally not to move forward.

## H.    The Founders Expel Trematerra.

During the balance of March and early April 2023, the Founders made a series of proposals to Trematerra.[51] The Founders also sought to create sources of leverage to improve their negotiating position vis-à-vis Trematerra.

As one source of leverage, Daniel asked Push and Nartowicz to assert that the Company had breached their consulting agreements because Trematerra had failed to pay their invoices in full and on time. Daniel did so to "try to create grounds where [he] could hold Peter in default under the [LLC Agreement],"[52] which would give the Founders the ability to invoke the Expulsion Provision. It didn't work. Gravity and Nartowicz wrote letters to Trematerra and Russo saying that the Company had no further obligations to them.[53] The Company owed Push money, but the Founders had agreed with Trematerra that Push failed to perform and did not deserve full payment.[54]

---

[51] *E.g.*, JX 160; JX 161; JX 163; JX 300.

[52] Daniel Tr. 294–95; *see* JX 104 at 4; JX 158.

[53] JX 175; JX 184.

[54] JX 58 at 168; Russo Dep. 28–32, 163; *see also* JX 154 at 146–47.

The Founders also looked for alternative investors who might help buy out Trematerra or, at a minimum, relieve their dependence on him. In May 2023, they met with Arthur Benjamin, who they thought could replace Trematerra. After meeting with Founders on May 31, 2023, Arthur Benjamin put the Founders in touch with his "legal strategist," Albert Santoro.[55] Santoro's checkered past includes being disbarred by the State of New York after pleading guilty to the federal felony charge of operating "unlicensed money transmitting business in violation of 18 USC [sic] § 1960."[56] Santoro was readmitted to the New York bar on June 15, 2023.[57]

In early June 2023, Arthur Benjamin, Santoro, and the Founders worked together on how to get rid of Trematerra. They decided that the Founders would invoke the Expulsion Provision "to remove [Trematerra] from the company and then, after that, try to negotiate a deal with him."[58] They believed that expelling Trematerra would allow them to negotiate from a position of strength.

On June 7, 2023, the Founders executed a resolution that purported to invoke the Expulsion Provision and expel Trematerra (the "Expulsion Resolution").[59] The Expulsion Resolution cited nine reasons (the "Original Reasons"):

---

[55] JX 10 at 1–2.

[56] JX 23 at 2.

[57] JX 228.

[58] Daniel Tr. at 183.

[59] JX 210.

19

1) [Trematerra] has not made "additional investments of equity capital in the Company" as provided for in the [LLC Agreement] and which was a material inducement for the disinterested members to enter into the [LLC Agreement] with [Trematerra]; and

2) [Trematerra] has made multiple unilateral material business decisions without express, actual and/or apparent authority, and without consulting with the other Members; and

3) [Trematerra] has willfully, and without good cause, refused to pay vendors of [the Company], including, but not limited to, [Push] (more than $15,000.00), [Gravity] (more than $6,000.00), [and] Jay Nartowicz (more than $9,000.00) thereby hurting necessary and important business relationships with said vendors and subjecting [the Company] to potential tort and other damages, in addition to the expending [sic] significant legal fees to defend any such suits; and

4) [Trematerra] without authority, and without the consent of the other Members, negotiated a lease agreement in the name of [the Company] in Los Angeles, California (hereinafter "LA Lease") to the detriment of [the Company]; and

5) [Trematerra] without authority, and without the consent of the other Members, unilaterally modified said LA Lease by making material (but not easily visually observed) changes to the lease that were not disclosed to the leasing agent nor landlord thereby setting off a negative chain of events that permanently damaged and disparaged the reputation of [the Company] and [the Original LLC]; and

6) [Trematerra] then defaulted in the payment of said LA Lease thereby subjecting [the Company] to extensive and expensive exposure to litigation from the landlord and leasing agent of said LA Lease location; and

7) [Trematerra's] actions regarding the LA Lease caused extensive material financial harm to [the Company] that is still yet to be determined but in no event is less than five million dollars ($5,000,000.00US); and

8) [Trematerra] . . . engaged in threatening and extortive behavior towards the other Members of [the Company]; and

20

9) Such other tortious, harmful, damaging, unlawful, and/or illegal conduct that will be further memorialized in a civil action currently being prepared by counsel.[60]

Trematerra contends that the Original Reasons could not support his expulsion. This decision addresses those reasons in the Legal Analysis.

The same day, the Founders sent a cease-and-desist letter to Trematerra telling him that the Founders had expelled him and were preparing to file suit against him and his affiliates.[61]

The members' legal representatives later exchanged a series of communications. The discussions went nowhere.

## I.    This Litigation

On June 28, 2023, Trematerra filed this litigation. He sought a declaration that the Expulsion Resolution was invalid, asserted that the Founders breached the LLC Agreement by adopting the Expulsion Resolution, and asked for damages under the Indemnification Provision. The Founders counterclaimed for declaratory judgments that the Expulsion Resolution was valid, that Trematerra had breached the LLC Agreement, and that they were entitled to damages under the Indemnification Provision.

Trematerra contemporaneously reached a settlement with the Landlord. In return for a payment of $36,000, he obtained a global release of claims for himself,

---

[60] *Id.* at 1–2.

[61] JX 211.

the Company, and the Founders.[62] Neither the Company nor the Founders have incurred any expense for the Lease.[63]

During discovery, the Founders served interrogatory responses identifying more reasons why Trematerra had breached the LLC Agreement (the "Additional Reasons"). This decision addresses those reasons in the Legal Analysis.

The parties cross-moved for summary judgment. The court granted the motions in part. The parties proceeded to trial.

## II.    LEGAL ANALYSIS

The outcome of the case turns on whether the Founders validly expelled Trematerra. As the parties who relied on the Expulsion Provision to take Trematerra's property, the Founders bore the burden of proving compliance with its terms. That allocation also avoided forcing Trematerra to prove a negative.

### A.    Compliance With The Expulsion Provision

Whether the Founders validly invoked the Expulsion Provision presents an issue of contract interpretation. The Founders bore the burden of proving that at least one of the Original Reasons or Additional Reasons justified expulsion.

#### 1.    Contract Interpretation Principles

The Expulsion Provision appears in the LLC Agreement, which is governed by Delaware law. Under Delaware law, "[w]hen interpreting a contract, the role of a

---

[62] JX 236 at 2.

[63] Daniel Tr. 305; Trematerra Tr. 421; *See* JX 146 at 26.

22

court is to effectuate the parties' intent."[64] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[65]

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[66] The "contract's construction should be that which would be understood by an objective, reasonable third party."[67] "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."[68] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[69]

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein."[70] "[T]he meaning which

---

[64] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[65] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[66] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[67] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal quotation marks omitted).

[68] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins.*, 616 A.2d 1192, 1195 (Del. 1992).

[69] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[70] *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).

arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."[71] "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument."[72]

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning."[73] If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity."[74] Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry."[75] A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing."[76] "When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the

---

[71] *Id.*

[72] *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[73] *Alta Berkeley*, 41 A.3d at 385 (footnote omitted).

[74] *Salamone*, 106 A.3d at 374.

[75] *Id.* (alteration in original) (internal quotation marks omitted).

[76] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997).

interpretation of the agreement.'"[77] "[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common."[78]

### 2. The Expulsion Requirements

The Expulsion Provision states:

> A Member may be expelled from the Company by unanimous vote of all other Members (not including the Member to be expelled) if that Member (a) has willfully violated any provision of this Agreement; (b) committed fraud, theft, or gross negligence against the Company or one or more Members of the Company, (c) engaged in wrongful conduct that adversely and materially affects the business or operation of the Company or (d) met any other condition that allows a member to be expelled under the Act.[79]

Although the Expulsion Provision identifies four categories of conduct that justify expulsion, the fourth refers to "any other condition that allows a Member to be expelled under the Act," a term that refers to the Delaware Limited Liability Company Act (the "LLC Act").[80] The LLC Act does not contain a default provision authorizing members to expel other members. The Founders must therefore prove that they satisfied one of the first three grounds.

---

[77] *Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 398 (Del. Ch. 2008) (quoting Restatement (Second) of Contracts § 202 (Am. L. Inst. 1981).

[78] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (footnote omitted).

[79] OA § 15.04.

[80] OA ¶ A.

### a. The Fraud, Theft, And Gross Negligence Requirements

Category (b) is the easiest to address and informs the interpretation of the other categories. It authorizes expulsion when a member has "committed fraud, theft, or gross negligence against the Company or one or more members of the Company." "Where a word has attained the status of a term of art and is used in a technical context, the technical meaning is preferred over the common or ordinary meaning."[81] "When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."[82]

The plain meaning of "committed fraud" means conduct that would constitute fraud at common law (the "Fraud Requirement"). Stated more generally, it means "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right."[83]

---

[81] *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) (internal quotation marks omitted) (quoting *Viking Pump, Inc. v. Liberty Mut. Ins.*, 2007 WL 1207107, at *13 (Del. Ch. Apr. 2, 2007)).

[82] *Id.*

[83] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993) (internal quotation marks omitted) (citing BLACK'S LAW DICTIONARY 337 (5th ed. 1983)); *accord Fraud*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("A knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment.").

The plain meaning of "committed . . . theft" means conduct that would constitute theft at common law (the "Theft Requirement"). Theft requires the "taking or appropriating of something belonging to another" and "a culpable mental state."[84]

The plain meaning of "committed . . . gross negligence" is equally straightforward. In civil cases not involving business entities, the Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"[85] This test "is the functional equivalent" of the test for "[c]riminal negligence."[86] By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.[87]

---

[84] *Travis v. Escape Hosp., LLC*, 2020 WL 1170768, at \*3 (Del. Super. Ct. Feb. 28, 2020). *Cf.* 11 *Del. C.* § 841(a) ("A person is guilty of theft when the person takes, exercises control over or obtains property of another person intending to deprive that person of it or appropriate it.").

[85] *See, e.g.*, *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting William Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)).

[86] *Jardel Co. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).

[87] 11 *Del. C.* § 231(a).

Under this framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it remains "a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm."[88]

In cases involving business entities, however, gross negligence has acquired its own, special meaning and requires conduct akin to recklessness.[89] By statute, Delaware has defined recklessness as a situation where "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct."[90] The risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[91] For purposes of its entity law,

---

[88] *Jardel*, 523 A.2d at 530.

[89] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) ("[T]he definition [of gross negligence in corporate law] is so strict that it imports the concept of recklessness into the gross negligence standard . . . ."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (internal quotation marks omitted)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (internal quotation marks omitted)); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (explaining that to be grossly negligent, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." (internal quotation marks omitted)).

[90] 11 *Del. C.* § 231(e).

[91] *Id.*; *see id.* § 231(a).

Delaware law requires conduct more serious than what would be necessary to secure a conviction for criminal negligence.[92] The plain meaning of "committed . . . gross negligence" therefore means to have acted recklessly (the "Recklessness Requirement").

### b. The Willful Breach Requirement

Category (a) authorizes expulsion when a member has "willfully violated any provision of this agreement." To violate a contractual provision means to breach it (the "Willful Breach Requirement").

In the *XRI* decision, this court addressed what constituted the "willful breach" of an LLC agreement where the parties have not defined that term, but where the agreement juxtaposed the concept of willful breach with the concept of gross negligence.[93] In *XRI*, those terms appeared in the definition of "Disabling Conduct." Proof of Disabling Conduct would foreclose an otherwise covered person from receiving indemnification.[94]

The *XRI* decision noted that courts and scholars have proposed a range of standards for evaluating willful breach.[95] Under a strict view, the breaching party

---

[92] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 689 (Del. Ch. 2023).

[93] *XRI Inv. Hldgs LLC v. Holifield*, 2024 WL 3517630, at *21 (Del. Ch. July 24, 2024).

[94] *Id.* at *20.

[95] *Id.* at *21–22.

must have known that the conduct would constitute a breach and have acted purposefully to breach the contract. Under an even stricter view, the breaching party must have specifically intended to harm the counterparty such that the breach constituted an intentional tort.[96]

At the other end of spectrum, the *Hexion* decision held that a party commits a knowing and intentional breach when the party knowingly and intentionally acts, regardless of whether the party knows that action will constitute a breach.[97] The *Hexion* decision rejected the argument that the breaching party must also know its conduct constitutes a breach as "simply wrong."[98] For support, the court looked to criminal law:

> Momentarily drawing the analogy to criminal law . . . makes this immediately clear: it is the rare crime indeed in which knowledge of the criminality of the act is itself an element of the crime. If one man intentionally kills another, it is no defense to a charge of murder to claim that the killer was unaware that killing is unlawful. Similarly, if a man takes another's umbrella from the coat check room, it may be a defense to say he mistakenly believed the umbrella to be his own (a mistake of fact). It is no defense to say he had not realized that stealing was illegal, nor is it a defense that it was not his "purpose" to break the law, but simply to avoid getting wet. . . . [A] mistake of law virtually never excuses a violation of law.[99]

---

[96] *See generally* Michael B. de Leeuw & Brian J. Howard, *What Is a Willful Breach of Contract?*, N.Y. L. J. (Apr. 3, 2006).

[97] *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746–48 (Del. Ch. 2008).

[98] *Id.*

[99] *Id.* at 746–47.

The *Hexion* decision interpreted an acquisition agreement, and since then, parties to acquisition agreements have often contracted around that interpretation by defining a term like willful breach to require that the breaching party know its intentional conduct constitutes a breach.[100]

Scholars have suggested still more framings. Professor Richard Craswell argues that a willful breach cannot be defined solely in terms of a mental state because it represents a legal conclusion that a breach is sufficiently serious to warrant increasing the damages amount and deterring similar conduct.[101] Professors Oren Bar-Gill and Omri Ben-Shahar similarly argue a willful breaches is one where

---

[100] *See, e.g.*, *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *5 (Del. Ch. Aug. 31, 2020) (noting that "[t]he Merger Agreement defined that term as conduct that both constituted a material breach and which the breaching party subjectively knew would constitute a material breach."), *aff'd*, 251 A.3d 1015 (Del. 2021); *Genuine Parts Co. v. Essendant Inc.*, 2019 WL 4257160, at *3 n.17 (Del. Ch. Sept. 9, 2019) ("The Agreement defines 'Willful Breach' as 'a breach of, or failure to perform any of the covenants or other agreements contained in this Agreement, that is a consequence of an act or failure to act by the breaching party . . . with actual knowledge that such Person's act or failure to act would, or would reasonably be expected to, result in or constitute a breach of or failure of performance under the Agreement.'" (omission in original)). That does not mean they always do. A study of 1,000 merger and acquisition agreements finds that although the vast majority tie damages to a concept of willful breach, less than one-third of public deals and under one tenth of private deals define the term. *See generally* Theresa Arnold, Amanda Dixon, Madison Whalen Sherrill, Hadar Tanne & Mitu Gulati, *The Cost of Guilty Breach: Willful Breach in M&A Contracts*, 62 Bos. Coll. L. Rev. 32, 34, 45 (2021) (reviewing 1,000 M&A agreements and finding that over sixty percent tie damages to whether the breach was willful, but less than one-third of public and private deals define "willful" or "willful breach").

[101] *See* Richard Craswell, *When is a Willful Breach "Willful"? The Link Between Definitions and Damages*, 107 Mich. L. Rev. 1501, 1502–07 (2009).

an additional remedy is warranted, but frame the concept as a breach that reveals the counterparty to be "the type of transactor who readily chisels and acts in a dishonest way, and has likely exercised such bad faith in other occasions without being sanctioned."[102] Professors Steve Thel and Peter Siegelman argue that a willful breach harms the non-breaching party more than its benefits the breaching party, thus creating a deadweight loss. Under this view, a willful breach is one that cannot be justified as an efficient breach.[103]

The *XRI* decision interpreted an LLC agreement that juxtaposed "willful breach" with a breach resulting from "gross negligence."[104] Both terms modified concept the of "breach," not the act or omission giving rise to the breach. The terms seemed to be targeting scenarios in which the counterparty knew (willfulness) or consciously disregarded (gross negligence in the sense of recklessness) that its conduct would constitute a breach and yet went forward anyway. From that baseline, the *XRI* decision concluded that a willful breach for purposes of the LLC agreement meant that a party intentionally acted while knowing that the conduct would constitute breach. Put differently, the LLC agreement used the "willful" modifier to

---

[102] Oren Bar-Gill & Omri Ben-Shahar, *An Information Theory of Willful Breach*, 107 Mich. L. Rev. 1479, 1483 (2009).

[103] *See* Steve Thel & Peter Siegelman, *Willfulness Versus Expectation: A Promisor-Based Defense of Willful Breach Doctrine*, 107 Mich L. Rev. 1517, 1519–20, 1531 (2009).

[104] *XRI*, 2024 WL 3517630, at *23.

require that the counterparty both act intentionally and know that its action would cause a breach.[105]

The same reasoning applies here. As in *XRI*, the LLC Agreement juxtaposes the concepts of "willful breach" and "gross negligence."[106] As in *XRI* the LLC Agreement is not addressing willful conduct generally. The LLC Agreement instead envisions a scenario in which the counterparty knows that its conduct would constitute a breach and yet goes forward anyway.

### c. The Wrongful Conduct Requirement

That leaves category (c), which involves "wrongful conduct that adversely and materially affects the business or operation of the Company" (the "Wrongful Conduct Requirement"). The threshold requirement is "wrongful conduct." That wrongful conduct must also have "adversely and materially affect[ed] the business or operation of the Company."

No Delaware decision has addressed what "wrongful conduct" means. But many decisions—too many to cite—use the term in a generic and capacious sense to mean conduct that could give rise to a remedy at law or in equity. That approach comports with the plain meaning of the term "wrongful." *Black's Law Dictionary* defines "wrongful" as "[c]haracterized by unfairness or injustice," and "[c]ontrary to

---

[105] *Id.*

[106] *See XRI*, 2024 WL 3517630, at *23; OA § 15.04.

law" and "unlawful."[107] Dictionaries of standard English offer meanings like "unjust or unfair," or "having no legal right; unlawful."[108] Those expansive definitions encompass both acts involving wrongful intent, such as a subjective intent to cause harm, and acts that are inherently wrongful, such as violations of law. The term is thus broader than "intentional misconduct," which focuses on whether the party "(1) acted intentionally to harm those to whom he owes the duty or (2) intentionally or consciously ignored his duties, thereby causing harm to those to whom he owes the duty to refrain from intentional misconduct."[109]

Perhaps because of the expansive meaning of "wrongful conduct," the Expulsion Provision requires wrongful conduct that "adversely and materially affects the business or operation of the Company." That phrase is a deconstructed version of the phrase "material adverse effect," which has achieved the status of a term of art in acquisition agreements.[110]

---

[107] *Wrongful*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[108] *Wrongful*, DICTIONARY.COM, https://www.dictionary.com/browse/wrongful (last visited May 9, 2025); *see also Wrongful*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/wrongful (last visited May 9, 2025) (defining "wrongful" as "Wrong, unjust," "unlawful" and "having no legal claim").

[109] *Dawson v. Pittco Cap. P'rs, L.P.*, 2012 WL 1564805, at *28 n.303 (Del. Ch. Apr. 30, 2012); *accord A & J Cap., Inc. v. L. Off. of Krug*, 2019 WL 367176, at *12 (Del. Ch. Jan. 29, 2019), *aff'd*, 222 A.3d 143 (Del. 2019).

[110] *See Akorn, Inc. v. Frensenius Kabi AG*, 2018 WL 4719347, at *85 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018); *accord Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *38 (Del. Ch. Apr. 30, 2021) ("Put differently, the materiality standard at issue asks whether the business deviation significantly alters

"In any M & A transaction, a significant deterioration in the selling company's business between signing and closing may threaten the fundamentals of the deal."[111] "Merger agreements typically address this problem through complex and highly negotiated 'material adverse change' or 'MAC' clauses, which provide that, if a party has suffered a MAC within the meaning of the agreement, the counterparty can costlessly cancel the deal."[112] Despite the attention that contracting parties give to these provisions, agreements typically do not define what is "material."[113] "What

---

the buyer's belief as to the business attributes of the company it is purchasing."); *see Williams Cos., Inc. v. Energy Transfer LP*, 2021 WL 6136723, at *25–26 (Del. Ch. Dec. 29, 2021) (applying Akorn meaning of "in all material respects" qualifier to a covenant in a merger agreement); *AB Stable VIII LLC v. Maps Hotels and Resorts One LLC*, 2020 WL 7024929, at *73 (Del. Ch. Nov. 30, 2020) (same); *Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *26–29 (Del. Ch. Aug. 10, 2020) (applying *Akorn* meaning of "in all material respects" qualifier to a representation in a merger agreement); *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *17 (Del. Ch. Dec. 18, 2019) (same); *see also Anthem-Cigna*, 2020 WL 5106556, at *134 n.426 (distinguishing common law "material breach" standard from "in all material respects" standard).

[111] *Akorn*, 2018 WL 4719347, at *47.

[112] Robert T. Miller, *The Economics of Deal Risk: Allocating Risk Through MAC Clauses in Business Combination Agreements*, 50 Wm. & Mary L. Rev. 2007, 2012 (2009) (footnote omitted); *accord* Andrew A. Schwartz, *A "Standard Clause Analysis" of the Frustration Doctrine and the Material Adverse Change Clause*, 57 UCLA L. Rev. 789, 820 (2010) ("[T]he MAC clause allows the acquirer to costlessly avoid closing the deal if the target's business suffers a sufficiently adverse change during the executory period."); *see* Jeffrey Manns & Robert Anderson IV, *The Merger Agreement Myth*, 98 Cornell L. Rev. 1143, 1153 (2013) ("The MAC/MAE Clause gives teeth to the closing conditions in specifying what type of events would entitle the acquiring company to call the deal off if events occur between signing and closing that make the deal less advantageous than expected.").

[113] *Akorn*, 2018 WL 4719347, at *48.

constitutes an MAE, then, is a question that arises only when the clause is invoked and must be answered by the presiding court."[114]

Outside the acquisition context, adding a materiality qualifier to a provision "strives to limit [the contract term] to issues that are significant in the context of the parties' contract, even if the breaches are not severe enough to excuse a counterparty's performance" under the common-law doctrine of frustration of purpose.[115] The law governing MAEs in the acquisition context is a specific application of the general rule that materiality must be "significant in the context of the parties' contract."

The Wrongful Conduct Requirement therefore requires a fact-specific determination that the harm from the wrongful conduct is sufficiently material to warrant expulsion. Under the Expulsion Provision, the Wrongful Conduct Requirement is the only basis for expulsion that expressly requires harm to the Company.

---

[114] Y. Carson Zhou, Essay, *Material Adverse Effects as Buyer-Friendly Standard*, 91 N.Y.U. L. Rev. Online 171, 173 (2016), http://www.nyulawreview.org/sites/default/files/NYULawReviewOnline-91-Zhou.pdf (noting that in the typical MAE provision, the core concept of materiality is "left undefined"); see *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *34 (Del. Ch. Apr. 29, 2005) ("The parties chose to use the term 'Material Adverse Effect' and it is the Court's function to discern what they intended. . . . The notion of an MAE is imprecise and varies both with the context of the transaction and its parties and with the words chosen by the parties.").

[115] *Akorn*, 2018 WL 4719347, at *86.

The parties disagree on whether the other requirements implicitly require harm. Both sides cite the *A&J* case.[116] There, the court interpreted a removal provision that required a showing of grossly negligent or fraudulent conduct but said nothing about harm. The court held that this phrase "necessarily incorporate[d] an appreciation that the proscribed conduct must either be harmful or cause harm to justify removal."[117] The court offered four reasons for that conclusion:

> First, the operative agreements do not state that the Class B Manager may be removed for grossly negligent or fraudulent *conduct*; they state, instead, that removal will be justified, among other reasons, for "gross negligence" or "fraud." Second, and more to the point, the contractually imposed standards of conduct necessarily incorporate an appreciation that the proscribed conduct must either be harmful or cause harm to justify removal. If there is no risk of harm to the Company as a result of the Manager's actions, then there can be no deviation from the standards of care or conduct contemplated by the definitions of gross negligence, intentional misconduct, fraud or deceit. Third, Krug has not cited any case in support of his construction of the contractual removal standards that would justify divorcing the proscribed conduct from anticipated or actual harm caused by the conduct and he does not appear to disagree that the parties likely incorporated the elements of the standards as commonly known in our law. And finally, even if harm (foreseeable or actual) were divorced from the contractual standards as Krug would have it, as explained below, the preponderance of evidence does not support the contention that A & J [sic] violated any of the standards of conduct in connection with any of the alleged grounds for removal.[118]

---

[116] *A & J Cap., Inc. v. L. Off. of Krug*, 2019 WL 367176 (Del. Ch. Jan. 29, 2019), *aff'd*, 222 A.3d 143 (Del. 2019).

[117] *Id.* at *11–12.

[118] *Id.* (footnotes omitted).

Those reasons are unpersuasive for purposes of this case, where the Expulsion Provision requires a showing of harm for the Wrongful Conduct requirement but not for other requirements.

Taking the *A&J* reasons in reverse order, the fourth reason acknowledges that the analysis is *dictum*. Because none of the standards of conduct were violated, the *A&J* decision did not have to reach the issue of whether the removal provision also required harm.

The third reason—the absence of prior precedent—should not be dispositive when the language of a contract is clear and unambiguous. "Delaware is a contractarian state that holds parties' freedom of contract in high regard,"[119] and particularly so for alternative entity agreements.[120] If parties frame a removal provision not to require a showing of harm, then a court should enforce that language.

The second reason is an example of *ipse dixit*: reasoning that the terms incorporate a harm requirement because "the contractually imposed standards of

---

[119] *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024); *accord Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 355 (Del. 2022) ("Delaware is a contractarian state.").

[120] *See* 6 *Del. C.* § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); *Holifield v. XRI Inv. Hldgs LLC*, 304 A.3d 896, 924 (Del. 2023) (agreeing with litigant that "Delaware is a contractarian state, particularly when it comes to construing LLC agreements.").

38

conduct necessarily incorporate an appreciation that the proscribed conduct must either be harmful or cause harm to justify removal." The paragraph then asserts that "[i]f there is no risk of harm to the Company as a result of the Manager's actions, then there can be no deviation from the standards of care or conduct contemplated by the definitions of gross negligence, intentional misconduct, fraud or deceit." But that is not so. A party can be grossly negligent and lucky such that no harm results. Members might not want a grossly negligent manager, even if that manager had been lucky enough to avoid any consequences. Or the members might not want a manager who took funds through intentional misconduct, fraud, or deceit, even if the taking was immaterial or the manager restored the funds so there was no harm.

Finally, the first reason—distinguishing between "gross negligence" or "fraud" and "grossly negligent or fraudulent *conduct*"—makes little sense. Try to imagine "gross negligence" or "fraud" divorced from any conduct. Even a grossly negligent decision involves a type of conduct: the making of the decision, including a potential decision not to act. And there can be conduct without harm.

The strongest reason embedded in the *A&J* analysis suggests that when parties use a well-known term like fraud that has common law elements, then satisfying the contract term requires satisfying all of the common law elements. And if the common-law claim requires harm, then the contractual standard should require harm. That argument has some force, but it invites the question of what the contract means by "fraud." Did the parties mean the common law cause of action with all its elements? Or did they mean a fraudulent representation? Just as members might not

want a grossly negligent but lucky manager, they also might not want a liar whom others happened not to believe (defeating the element of reliance).

This decision therefore does not follow *A&J* for purposes of requiring a showing of harm where the LLC Agreement does not expressly require it. To be sure, conduct justifying expulsion often will include harm, if only as a factor distinguishing *de minimis* missteps from conduct warranting removal. But particularly where one base for expulsion requires harm (the Wrongful Conduct Requirement) and others do not, the plain language of the Expulsion Provision does not warrant implying a need to show harm for the other expulsion requirements.

### 3. The Original Reasons

The Founders expelled Trematerra based on the nine Original Reasons. Trematerra contends that the Original Reasons could not support his expulsion. This section addresses the Original Reasons in their order of significance, rather than their order of appearance.

### a. The Refusal To Invest Additional Capital

The first Original Reason asserted that Trematerra "has not made 'additional investments of equity capital in the Company' as provided for in the [LLC Agreement]."[121] Stated more formally, the Founders claimed that Trematerra failed to supply the Additional Capital Contributions when due. That reason invokes the

---

[121] JX 210 at 1.

Willful Breach Requirement by claiming that Trematerra had a contractual obligation to do something and failed to do it.

At first blush, the first Original Reason cannot satisfy the Willful Breach Requirement because the Founders cannot show that any Additional Capital Contribution was ever due. If the Company had called on Trematerra to provide more capital beyond the Initial Capital Contribution, then Trematerra would have had to provide it. If Trematerra had refused, then he would have breached the LLC Agreement. At that point, the Founders could have invoked the Willful Breach Requirement. But the Company never made a capital call on Trematerra.

Normally, that could end the analysis, but Trematerra repudiated his obligations under the LLC Agreement. "Under Delaware law, repudiation is an outright refusal by a party to perform a contract or its conditions entitling the other contracting party to treat the contract as rescinded."[122] "A statement not to perform unless terms different from the original contract are met also constitutes a repudiation."[123]

Trematerra repudiated his obligations under the LLC Agreement on March 4, 2023, when he wished the Founders "the best of luck" and asked for a buyout.[124]

---

[122] *CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 931 (Del. 2000). (internal quotation marks omitted).

[123] *Id.*

[124] JX 142.

41

Trematerra repudiated his obligations under the LLC Agreement again on March 13, 2023, when Trematerra told the Founders multiple times that he would not go forward with the Lease if they did not agree to the Restructuring.[125] He repudiated his obligations yet again when he told the Founders that he would cancel the Lease and not "spend any more time on this venture" until they could find a new "path [t]hat is . . . agreeable."[126] And he repudiated his obligations a final time on March 15, 2023, when he refused to move forward with one restaurant in California and asked for a buyout.[127]

To save himself from the consequences of his actions, Trematerra offers a more aggressive argument. Relying on language discussed below, he asserts that he could invest capital "in such amounts and at [his] discretion."[128] As he sees it, that meant he had no actual obligation to commit capital unless he wanted to. Assuming that obligation was discretionary (and as discussed below, it was not), Trematerra had to exercise his discretion in compliance with the implied covenant of good faith and fair dealing.[129] He thus had a real obligation to provide capital, and he repudiated that obligation.

---

[125] *See* JX 154 at 2, 46–47.

[126] JX 155.

[127] JX 154 at 37–42.

[128] Trematerra Tr. 195–96; *see also infra* Part II.A.4.a.

[129] *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 620 n.37 (Del. 2023) ("[W]hen a contract confers discretion on one party, the implied covenant requires

Trematerra knew that the Company faced expense that he would need to fund. He and the Founders had decided to develop a store at the Beverley Hills site. After Trematerra secured the Lease, he was obligated to fund the development of a store at that location using the Additional Capital Contribution he had agreed to provide. Trematerra could not rely on the fact that the original business plan contemplated building out three stores rather than one, because the original business plan was not part of the governing documents.

Trematerra could have called a meeting and tried to convince the Founders to adopt his view, terminate the Lease, and abandon California. If that meeting ended in deadlock, then Trematerra could have used the Tiebreaking Vote to defeat the capital call. That course of action, however, would have led to a breach of duty. The LLC Agreement did not eliminate fiduciary duties, and it contemplated that Trematerra exercised the Tiebreaking Vote as a member-manager. Like a director, Trematerra therefore owed fiduciary duties when exercising the Tiebreaking Vote, and he could not have vetoed a capital call selfishly and to the detriment of the Company.

Trematerra asserts that once the Founders told Trematerra that they did not want to start their restaurant business in California, he properly viewed the business as over. He did not have the power to make that decision unilaterally.

that the discretion be used reasonably and in good faith." (internal quotation marks omitted)).

Trematerra's repudiation of his obligations to make the Additional Capital Commitments satisfies the Willful Breach Requirement. At a minimum, it satisfies the Recklessness Requirement. The first Original Reason justified expelling Trematerra.

### b.    The Lease Issues

The Expulsion Resolution includes four Original Reasons relating to the Lease. Although the first three fall short, the fourth justified Trematerra's expulsion.

One Original Reason in the Expulsion Resolution asserted that Trematerra "without authority, and without the consent of the other Members, negotiated" the Lease.[130] Another Original Reason asserted that Trematerra "without authority, and without the consent of the other Members, unilaterally modified" the Lease "by making material (but not easily visually observed) changes to the [L]ease that were not disclosed to the leasing agent nor landlord."[131] The latter Original Reason refers to conduct that occurred during the negotiation of the Lease, making it an example of the former Original Reason.

Neither Original Reasons justified expulsion. By claiming that Trematerra acted without authority, both Original Reasons invoked the Willful Breach Requirement. But the Founders authorized Trematerra to negotiate the Lease. He did not breach any provision in the LLC Agreement by carrying out that decision.

---

[130] JX 210 at 2.

[131] *Id.*

44

A third Original Reason asserts that Trematerra's "actions regarding the [Lease] caused extensive material financial harm to [the Company] that is still yet to be determined but in no event is less than five million dollars."[132] But causing harm to the Company does not justify expulsion. The Expulsion Provision focuses on types of conduct. It does not authorize the other members to expel a member simply because a decision turned out poorly. In the end, the decision to terminate the Lease did not. Trematerra settled with the Landlord with no liability for the Company or the Founders.

The last Lease-related Original Reason, however, is a different story. It asserted that Trematerra "defaulted in the payment of the [Lease] thereby subjecting [the Company] to extensive and expensive exposure to litigation from the [L]andlord."[133] That assertion targeted Trematerra's unilateral termination of the Lease, and it invoked the Recklessness Requirement.

Trematerra acted recklessly in cancelling the Lease. When assessing contractual or statutory compliance, Delaware requires that parties observe legal formalities, even when a party could have satisfied them.[134] The Majority Vote

---

[132] *Id.*

[133] *Id.*

[134] *See Espinoza v. Zuckerberg*, 124 A.3d 47, 50 (Del. Ch. 2015) (explaining need for a controlling stockholder should not be "immune from the required formalities that come with [its] power"); *id.* at 57 ("[E]ven if a controlling stockholder manifests a clear intent to ratify a decision outside of a stockholder meeting, the ratification

45

Requirement specified the requirements for the Company to take action. As a party to the LLC Agreement, Trematerra knew that he could not act unilaterally on the Company's behalf. Nor did the Tiebreaking Vote give him that power. Trematerra could only exercise the Tiebreaking Vote at a meeting, and only after deadlock existed.

The restrictions in the LLC Agreement on member action by written consent made it all the more clear that Trematerra could not act unilaterally. Under the Delaware General Corporation Law, directors may act without a meeting only by unanimous written consent.[135] Under the default rules of the LLC Act, members and managers may act without a meeting by written consent from managers having "not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all managers entitled to vote thereon were present and voted."[136] So under the default rule, Trematerra could have acted by written consent, *but the LLC Agreement opted out of the default rule and required unanimous written consent.*[137] The parties consciously chose a governance regime in which Trematerra could not act unilaterally.

---

will not be effective unless it complies with the technical requirements of Section 228.").

[135] 8 *Del. C.* § 141(f).

[136] 6 *Del. C.* § 18-404(d).

[137] OA § 8.05(a).

Once the Founders had said they did not want to launch in California, Trematerra could have called a meeting of members to agree on a path forward. After learning about the Lease and its favorable terms, the Founders likely would have agreed to move forward in California, as they later proposed. If Trematerra wanted to cancel the Lease, then he could have proposed that course of action during the meeting. If he and the Founders deadlocked, then Trematerra could have exercised the Tiebreaking Vote. Armed with a decision that satisfied the Majority Voting Requirement, Trematerra could have cancelled the Lease. He could not simply make that decision for himself. At a minimum, Trematerra consciously disregarded the need for formal action at a meeting.

Trematerra responds that he properly sought to mitigate the damages that the Company would face, as well as his own exposure under the Personal Guaranty. But the issue is one of authority, and Trematerra lacked the authority to terminate the Lease. Trematerra was also wrong to view the Lease only as a liability. Because of the favorable terms he secured, it was also an asset.

Trematerra also argues that he later achieved a settlement with the Landlord under which the Company and the Founders owe nothing. For the reasons discussed previously, the Recklessness Requirement does not require harm. In any event, when the Founders acted, Trematerra had not yet achieved a settlement, and the Founders reasonably perceived that Trematerra's actions had harmed the Company.

Separately and independently, Trematerra acted recklessly as a business matter. Having negotiated the Lease, Trematerra knew it favored the Company. Because it was so valuable, he threatened the Founders with cancelling the Lease unless they agreed to the Restructuring. Yet when the Founders refused to agree to the Restructuring, Trematerra immediately cancelled the Lease. There was no reason to act rashly. The Company did not owe any rent under the Lease for 240 days. Any rational person acting in good faith would have called a meeting of members to discuss how to proceed. Instead, Trematerra cancelled the Lease just one day after signing it, thereby generating a dispute with the Landlord and depriving the Company of a valuable asset.

Trematerra's unilateral termination of the Lease satisfied the Recklessness Requirement. The Founders were justified in expelling him on that basis.

### c. The Willful Failure To Pay Vendors

The third Original Reason asserts that Trematerra "willfully, and without good cause, refused to pay vendors . . . , including, but not limited to, [Push] (more than $15,000.00), [Gravity] (more than $6,000.00), [and] Jay Nartowicz (more than $9,000) thereby hurting necessary and important business relationships," thereby subjecting the Company "to potential tort and other damages, in addition to the expending [sic] significant legal fees to defend any such suits."[138] That assertion could implicate the

---

[138] JX 210 at 2.

Willful Breach Requirement or the Wrongful Conduct Requirement, but it does not satisfy either.

The third Original Reason does not satisfy the Willful Breach Requirement because for that requirement to apply, the Founders needed to point to a specific provision that Trematerra violated. Nothing in the LLC Agreement requires payment of any bill no matter what.

The third Original Reason could satisfy the Recklessness Requirement if Trematerra withheld payment under circumstances where he knew that doing so carried a material risk of harming the Company. Trematerra had a reasonable basis to believe he was justified in withholding payment for partial performance or non-performance. He did not act recklessly.

The third Original Reason could satisfy the Wrongful Conduct Requirement if Trematerra intentionally failed to pay vendors to harm the Company. The evidence does not support that theory.

The Wrongful Conduct Requirement also requires proof that the wrongful conduct "adversely and materially affect[ed] the business or operation of the Company." The Founders failed to prove that Trematerra's payment decisions had that effect. Push has said it would work with the Founders again.[139] Nartowicz "no longer want[ed] anything further to do with [the Company],"[140] but he remains

[139] Daniel Tr. 279.

[140] JX 253.

49

willing to work with Trematerra.[141] That distinction indicates that Trematerra was not the problem. Gravity also wanted to quit because of Daniel, not Trematerra.[142]

### d. The Non-Specific Reasons

Three other Original Reasons are not sufficiently specific to support expulsion. The second Original Reason asserts that Trematerra "made multiple unilateral material business decisions without express, actual and/or apparent authority, and without consulting with the other Members."[143] That reason does not identify any specific decisions that Trematerra made, and Daniel conceded at trial that other Original Reasons cover more specifically anything that the second Original Reason might encompass.

The ninth Original Reason is similarly non-specific. It refers to "[s]uch other tortious, harmful, damaging, unlawful, and/or illegal conduct that will be further memorialized in a civil action currently being prepared by counsel."[144] That item does not identify a basis for expulsion. It alludes to potential reasons.

---

[141] Trematerra Tr. 369–70; JX 15 at 14.

[142] JX 83 at 1–2; Russo Dep. 138–40.

[143] JX 210 at 2.

[144] *Id.*

The eighth Original Reason asserts that Trematerra "engaged in threatening and extortive behavior towards the other Members of [the Company]."[145] The Expulsion Notice says only that. Brevity can be a virtue. Here, it is a defect.

### 4. The Additional Reasons

Besides relying on the Original Reasons, the Founders identified more reasons during this litigation that they claimed justified Trematerra's expulsion. None of them do the trick.

A party who terminates a counterparty on specific grounds can defend the termination decision on alternative grounds if the party can satisfy the after-acquired-evidence doctrine.[146] Under that doctrine, the party must have learned about the justification after the termination, and the justification must independently support termination.[147] Learning about the justification after the termination is necessary because if the terminating party knew about the justification before the termination and did not rely on it, then the party presumptively waived reliance on that justification by not citing it at the time of termination.[148] And if the justification

---

[145] *Id.*

[146] *See generally* Stephen J. Humes, Annotation, *After-Acquired Evidence of Employee's Misconduct as Barring or Limiting Recovery in Action for Wrongful Discharge*, 34 A.L.R. 5th 699 (1995 & Supp.).

[147] *Davenport Gp. MG, L.P. v. Strategic Inv. P'rs, Inc.*, 685 A.2d 715, 723 (Del. Ch. 1996).

[148] *See Tatum v. Fairstead Affordable LLC*, 2023 WL 8923400, at *3–4 (Del. Ch. Dec. 22, 2023) ("[The after-acquired doctrine] does not authorize an employer to learn about misconduct, make a business decision not to act on it, treat an employee

would not provide an independent basis for termination, then it becomes merely cumulative or confirmatory.[149] Reliance on after-acquired evidence is most persuasive when the terminated party concealed the evidence.[150] From a policy standpoint, the after-acquired evidence doctrine seeks to prevent a wrongdoer from benefitting from concealing evidence of its wrongdoing.

The limitations on the use of after-acquired evidence help reconcile its use with the "mend-the-hold" doctrine. That doctrine "bars a party who rejects a contract on certain specified grounds from changing position after litigation is filed when those grounds for rejection do not pan out."[151] As the Supreme Court of the United States explained long ago, "Where a party gives a reason for his conduct and decision touching any thing [sic] involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing

---

as having resigned, accept the benefits of that mode of departure, then reverse course months later."); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 879 (Del. Ch. 2022).

[149] *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 363 (1995) ("Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.").

[150] *Metro Storage*, 275 A.3d at 879.

[151] *Liberty Prop. Ltd. P'ship v. 25 Mass. Ave. Prop., LLC.*, 2008 WL 1746974, at *14 (Del. Ch. Apr. 7, 2008); *see Friel v. Jones*, 206 A.2d 232, 235 (Del. Ch. 1964).

it . . . ."[152] From a policy standpoint, the mend-the-hold doctrine seeks to limit unnecessary litigation by ensuring that a party cannot advance seriatim reasons for its actions, particularly when the reasons it cited contemporaneously fall short.[153]

### a. Failing To Make The Initial Capital Contribution

The Founders assert that Trematerra willfully breached the LLC Agreement by failing to make the Initial Capital Contribution at closing. Trematerra plainly had an obligation to contribute $200,000 to the Company upon executing the LLC Agreement, which he failed to do. But the Founders never demanded that Trematerra fulfill that obligation; they were content to let him pay the bills as they came due. The breach also is not after-acquired evidence, because the Founders knew about it all along. Trematerra's failure to make the Initial Capital Contribution therefore does not justify expulsion.

Section 3.2 of the Contribution Agreement expressly contemplated that Trematerra would contribute the Initial Capital Contribution at closing, just as one would expect. The operative language stated: "At the Closing, [Trematerra] will deliver . . . [Trematerra's] Initial Capital Contribution."[154] The LLC Agreement, by

---

[152] *Ry. Co. v. McCarthy*, 96 U.S. 258, 267 (1878).

[153] *See Harbor Ins. v. Cont'l Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990) (Posner, J.) (observing that when "[a] party . . . hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size [he] can properly be said to be acting in bad faith.").

[154] CA § 3.2(b)(i).

contrast, contained internally inconsistent provisions addressing Trematerra's capital contributions. Section 4.01(a) of the LLC Agreement tracked the Contribution Agreement by stating, again as one would expect, that each member would make its initial capital contributions "[c]ontemporaneously with the execution of this Agreement."[155]

But in an introductory section to a provision establishing that no member would need to contribute capital beyond its express commitments, Section 4.02 purported to authorize Trematerra to contribute "[Investor] Committed Capital" at any time with no deadline. That defined term encompassed both the Initial Capital Contribution and the Additional Capital Contributions. The operative language stated: "Except for the [Investor] Committed Capital to be made at such amounts and at the discretions [sic] of [Trematerra], no Member shall be required to make any Capital Contributions other than those specifically described by this Agreement, unless agreed to in writing by the contributing Member or required by Delaware Law" (the "No Additional Capital Exception").[156]

Based on the No Additional Capital Exception, Trematerra contends that he never had any obligation to commit any amount of capital to the Company by any deadline.[157] He claimed to be "under the impression that the money had to be put in

---

[155] OA § 4.01.

[156] OA § 4.02.

[157] Trematerra Tr. 357–58.

under [his] discretion when bills were due."[158] In other words, even when a bill was due, he could decide not to contribute the capital necessary to pay it. But that would make his capital commitments illusory. At other times he testified inconsistently with that position, accepting that he had an obligation to fund the restaurants as contemplated by the governing agreements. For example, Trematerra (i) never thought he could choose not to fund a restaurant and (ii) knew that developing even a single restaurant would require more funding than the Initial Capital Contribution.[159] Daniel testified that the Founders never would have given up their intellectual property for just the Initial Capital Contribution.[160]

The Founders acknowledge that the governing agreements are ambiguous. When shown only the No Additional Capital Exception, Daniel agreed with opposing counsel's leading question asking him to acknowledge that the language "means that [Trematerra] can put [his] capital into the company in such amounts and at its discretion; correct?"[161]

The record lacks any evidence revealing the origins or purpose of the No Additional Capital Exception. In light of its placement, the conflict with other express provisions, and the typographical error in "discretions," the No Additional Capital

---

[158] *Id.* at 361.

[159] Trematerra Tr. 448, 452.

[160] Daniel Dep. 68; *see also* Daniel Tr. 25–26.

[161] Daniel Tr. 195–96.

Exception does not look like language that received both sides' full attention. It looks like something that Trematerra's side slipped in.

When the governing agreements are read as a whole, the only reasonable interpretation is that Trematerra had to make the Initial Capital Contribution promptly after executing the LLC Agreement. He never did. That conduct breached the LLC Agreement. But it does not support expulsion.

First, the Founders never took issue with Trematerra's failure to make the Initial Capital Contribution. They allowed Trematerra to make his contribution by paying bills as they became due. Although the LLC Agreement contains a no-waiver provision,[162] the ability to rely on such a provision can itself be waived.[163] Here, the Founders waited so long to invoke Trematerra's obligation to make the Initial Capital Contribution that they waived both the no-waiver provision and the breach.

Second, the Founders did not cite Trematerra's failure to make the Initial Capital Contribution in the Expulsion Notice, and they cannot meet the requirements of the after-acquired evidence doctrine. Trematerra's failure to make the Initial

---

[162] OA § 18.05 ("Failure on the part of a person to complain of any act of any person or to declare any person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that person of its rights with respect to that default until the applicable statute-of-limitations period has run.").

[163] *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) ("The prohibition against amendment except by written change may be waived or modified in the same way in which any other provision of a written agreement may be waived or modified, including a change in the provisions of the written agreement by he [sic] course of conduct of the parties.").

Capital Contribution was known to everyone. Rather than satisfying the after-acquired evidence doctrine, allowing the Founders to invoke Trematerra's failure to make the Initial Capital Contribution would violate the mend-the-hold doctrine.

### b. Characterizing His Contributions As Loans

During this litigation, the Founders obtained evidence that Trematerra characterized his capital contributions to the Company as loans. The LLC Agreement obligated Trematerra to make equity contributions. An attempt to characterize his contributions as loans would have justified expulsion under both the Willful Breach Requirement and the Recklessness Requirement. The Founders, however, failed to carry their burden of proof.

There is some evidence that Trematerra breached his obligations under the LLC Agreement by characterizing the payments he made on behalf of the Company as loans rather than as equity contributions.[164] The Contribution Agreement and LLC Agreement contemplate that the Initial Capital Contribution and the Additional Capital Contributions were equity, not debt.

The evidence about the loans, however, is too thin to carry the Founders' burden of proof. The Founders could have pursued this issue further in discovery and developed a stronger record at trial. As it is, the court cannot rule in their favor.

_____

[164] *See* JX 92 (Company's business checking summary marking transfer from Trematerra as "loan"); JX 97 (same); JX 109 (same); *see also* Trematerra Tr. at 533–34 (Trematerra admitting that he wrote "loan" on multiple business checking summaries of the Company).

### c. Signing The Lease In The Name Of The Original LLC

Although no one realized it at the time, the Lease mistakenly identified the Original LLC as the tenant rather than the Company. The Founders made much of this, but it was an honest mistake that would have been fixed had anyone noticed. It does not satisfy any of the requirements for expulsion.

### d. A $5,000 Payment To Neuman

The Founders separately argue that Trematerra's expulsion was justified because he wrote a check from the Company's account for $5,377.39 to Eric Neuman, his personal attorney. Trematerra proved through supplemental evidence submitted by consent that he voided the Company check and paid Neuman from his own account. Both checks bear the same date, showing that the check written on the Company's account was a mistake. That mistake does not support expulsion.

## B. Indemnification

The Founders proved that they validly expelled Trematerra because they properly relied on two of the Original Reasons. In doing so, they proved that Trematerra breached the LLC Agreement. The Founders are therefore entitled to indemnification.

The Indemnification Provision states that "[t]o the fullest extent permitted by law, each Member shall indemnify the Company, each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on

account of any breach by that Member of this Agreement."[165] That provision covers both first-party and third-party claims.[166]

The Founders proved that Trematerra breached the LLC Agreement by repudiating his obligations to provide capital and unilaterally cancelling the Lease. The Founders are therefore entitled to recover their "expenses (including, without limitation, costs of suit and attorney's fees)."

The Founders proved no damages other than their litigation expenses. The parties must confer regarding a reasonable amount of expenses. If the parties cannot agree, the Founders must submit a Rule 88 affidavit specifying the amounts to which they are entitled. If Trematerra opposes the amounts sought, his counsel must file an affidavit specifying the expenses Trematerra incurred.

## III. CONCLUSION

The Founders proved they validly expelled Trematerra. The Founders also proved their entitlement to indemnification. Judgment will be entered in favor of the Founders and against Trematerra. Within thirty days, the parties must submit a proposed final order, agreed as to form. If there are issues that need to be addressed before a final order can be entered, then the parties must submit a joint letter

---

[165] OA § 18.11.

[166] *Int'l Rail P'rs LLC v. Am. Rail P'rs, LLC*, 2020 WL 6882105, at *8 (Del. Ch. Nov. 24, 2020).

identifying those issues and proposing a path forward. This instruction is not an invitation to raise new issues or seek a do-over.